## Ordronaux v. Rey.

By a marriage contract executed in France by parties domiciled there, on the eve of
their marriage, the wife under the provisions of the French law, put one-third of
her fortune into *community*, and excluded the residue therefrom, which residue
was to belong to her and be re-taken by her. The parties removed to New York,
and the husband died there twenty years afterwards. He had taken and used
in his business, the whole residue of his wife's property, as well as that of the
community. At his death, he was in equity seised of and entitled to real estate
in New York.

On a bill filed by his widow, claiming that the marriage settlement operated as a
*mortgage* on his whole estate, and that she was entitled to priority of payment
of all her demands arising under the settlement,

*Held*, 1. That according to the laws of France, if the parties had remained there,
she would have had no preference over other creditors of the husband in respect
of his movables, nor any lien by way of *privilege* over his immovables. She
would have had a *mortgage* upon his immovables.

2. That although the courts here, construing the settlement according to the *lex
loci contractus*, will give to her the same rights as a creditor, that the French law
would confer; they cannot and ought not to yield to her over real estate situated
here, a lien or priority unknown and repugnant to the laws and regulations of the
country *rei sitæ*.

3. Creditors here are entitled to rely upon those laws for the administration of their
debtor's estates.

4. The French Civil Code refuses to contracts made in a foreign country, the force
of a mortgage in France ; and international comity does not require us to pursue a
different course.

5. That therefore the complainant, whatever was the extent of her rights as a credi-
tor by reason of the contract of marriage, had no lien upon her husband's estate,
nor priority over his other creditors.

August 2, 1844.

THE bill in this cause was filed on the 11th day of May, 1842,
by Elizabeth Ordronaux, the widow of John Ordronaux, de-
ceased. It set forth the marriage of those parties at Paris in the
kingdom of France on the 13th of September, 1815 ; and that on
the 1st day of September, 1815, in contemplation of that event,
they entered into marriage articles or a settlement, before two
notaries at Paris, in conformity to the laws of France. Both
parties were natives of France, and were then residing there,
though the husband was a sea-captain, residing usually at New

York. The first article of the settlement provided that the betrothed lady and gentleman would hold in common property they might acquire, according to the provisions of the French Civil Code, by which Code their community should be managed, regulated and divided, in whatever country they might subsequently reside or acquire property.

By the second article, they agreed that each should pay their respective debts contracted before marriage, and the same should not be a charge either upon the property of the other party, or on that of the community. The third article declared that the future husband brought to the marriage and constituted as his portion, 300,000 francs, viz. 298,000 in cash, and 2000 in the value of his clothing, &c. in use, which amount the future wife thereby acknowledged.

The fourth article declared that she brought to the marriage as her portion, 300,000 francs, viz. 294,000 in cash, and 6000 in the value of her clothes, laces, jewels and diamonds, &c. in her use; and the future husband thereby consented to be charged with the amount of such dowry.

The fifth to the eighth articles were as follows:

" *Article Fifth.* Of the said property each party shall contribute to the community heretofore established, the sum of one hundred thousand francs, which will make a fund of two hundred thousand francs; and the surplus of the said portions together with what may subsequently come to each of the couple in personal or real property, by inheritance, gift, bequest, or otherwise, shall be excluded from the said community and belong to that one of the two who is entitled to the same, and be re-taken, besides his or her share, by him or his heirs or representatives.

" *Article Sixth.* The survivor of the future husband and wife, shall have and take as a *preciput* and before the division of the personal property of the said community, such articles as she may select, to the amount of sixty thousand francs, according to the appraisement in the inventory which shall then be made, or may take that sum in money at the election of the said survivor. The amount of the said *preciput* is not to be deducted from the gift hereinafter made.

" *Article Seventh.* If during the marriage, any inheritance or

rents belonging to either of the said parties separately should be sold, or the said rents should be re-purchased, the money arising therefrom shall be re-invested in the purchase of other real estate or rents, which shall belong to the party whose property was sold, and to his or her heirs and representatives—however, if the said re-investment should not be made on the day of the dissolution of the said community, it shall be made in the property thereof, and should that not be sufficient for the re-investment of the funds of the future wife, she shall have them invested in the individual property of the husband. The action for which re-investment shall be deemed a real action, and shall be the individual property of the party who shall be entitled to institute it, and his or her heirs and representatives.

" *Article Eighth.* The future wife and the children to be born of the marriage, shall have the right by renouncing the community at the time of its dissolution, should this community prove more onerous than profitable, to retake the whole amount of the portion brought by the said wife as herein before mentioned, together with whatever may have been acquired by her, during the continuance of the said community, in personal or real property, by inheritance, gift, bequest or otherwise, and should the wife herself make this renunciation she shall retake in addition to the *preciput* hereinbefore agreed upon, the whole to be taken free and clear of the debts and mortgages due by the said community, even though it should be charged with or sentenced to the payment thereof, in which case the wife and her children shall be discharged therefrom, and secured and indemnified therefor by the husband, and out of his *personal* or *individual* property which is legally mortgaged for the entire fulfilment of the clauses and stipulations of this contract."

By the ninth article, each party made a gift to the other in case of survivorship, of all the property of the one who should first die ; to be held by the survivor as a usufructuary for life, but without giving security or investing, and merely on giving a receipt and an inventory. In case there should be one or more children of the marriage living when the gift opened, then it should be reduced to one-fourth in full and entire ownership, and another fourth for life only to be held as before mentioned.

By the tenth and last article, each party reserved the right of taking 50,000 francs from the gift stipulated in article ninth, to be disposed of by a last will and testament.

The bill further stated that the parties resided in France till 1818, when contrary to the complainant's wishes, they removed to the city of New York. There were several children of the marriage. That her husband converted all her property and the joint property to his own purposes, without her consent, and made investments in the names of others, to defraud her of her rights under the settlement. That for this purpose, he purchased in 1837, lot 24 Leonard-street in this city for $4000, and took the title thereof in the name of John B. Rey, who knew of his object in so doing. That in 1839, Ordronaux left the United States and died abroad in 1841, leaving a will made in 1827 of which his wife was the executrix, and by which he bestowed all his property as if he had died intestate.. That all his estate was insufficient to make good to her the 300,000 francs which she brought to the marriage, or even the 200,000 which she kept for herself out of the community, and that she has other claims also growing out of the marriage articles. That she renounced the community after his death, by a proper instrument filed with the Surrogate in New York.

That Rey admits he has no interest in the lot in Leonard-street, except as trustee for John Ordronaux the son of the complainant and her deceased husband.

The bill prayed for an account by Rey, and that the title of the house and lot be conveyed to the complainant.

She subsequently filed a supplemental bill making Chastellain and Ponvert defendants, as lessees of the premises under Rey, who were indebted for rents accrued. Her son John was also made a party to this bill.

The answer of Rey admitted the principal matters stated in the bill. He alleged that the title of the house and lot was vested in him by Ordronaux, in trust for his son John. That he and the complainant lived unhappily, and were separated many years before his death. That he made the lease, and managed the premises himself till he left the country, and the rents have since accumulated, so far as they have been paid. Rey traversed the

complainant's right and claim in all its parts; and he also set up as a bar, the statute against fraudulent conveyances.

Chastellain and Ponvert also denied her rights in their answer. They admitted the purchase of the house and lot by Ordronaux in Rey's name, and claimed the same under a lease for seven years from May 1, 1838, at $550 annually. That on the 1st of August, 1842, there was unpaid $1198 44 of rent, against which they claimed to set off a note they held against Ordronaux for $1830 41, dated in 1835. That Rey had distrained for the rent, and they had brought replevin for the goods seized, which action was still pending.

The marriage contract and articles were proved by testimony taken in Paris on a commission, and the Code Napoleon was made evidence by a stipulation. It was also proved that $60,000 was paid to John Ordronaux from the maternal estate of the complainant in June, 1815, in anticipation of the marriage.

The statements in the answers were substantially proved; and it was conceded that Ordronaux died insolvent if the complainant were a creditor for the 200,000 francs.

*W. Curtis Noyes,* for the complainant, made the following points.

I. By the contract of marriage and the laws of France which it adopts to the exclusion of all others, the plaintiff became and was at the death of her husband, and after the renunciation set forth in the bill, a preferred creditor to the amount of the original sum brought by her to the marriage, being 300,000 francs, (under article 8th,) and to the 60,000 francs, provided for in article 4th, together with her accumulations; and also to *one-fourth* of all his estate in absolute ownership, and to another *fourth* for life, under article *ninth.* (Code Napoleon, Civil, articles 1421, 1081 to 1090, 1441, 1442, 1453 to 1459, 1492 to 1495, 1503, 1514, 1515, 1525, 1597; *Le Breton* v. *Miles,* 8 Paige, 261; *Decouche* v. *Savetier,* 3 J. C. R. 190; Clancy's Rights of Women, 494, chap. 4.)

II. To secure to her these sums, and the other provisions of the marriage contract the whole estate was "*legally mortgaged*" to her by the concluding part of the ninth article of the mar-

riage contract. (*Churchman* v. *Harvey*, Ambler, 340; 2 Des-saus. 299, 552; 2 Hill's Rep. So. Car. 423.)

III. For the sums thus due her, and for which the estate of Mr. Ordronaux was then mortgaged, she had a valid lien upon the property conveyed to the defendant Rey in 1837, and to the rents and profits thereof. These premises were purchased by the husband, paid for with his funds, and occupied by or under him during the time he remained in the country after the purchase was made :

1. If there was no resulting trust in his favor arising from the fact that he paid the whole purchase money, still a trust resulted to the complainant as his chief creditor under the marriage contract, and therefore to pursue the property in the hands of all but *bona fide* purchasers. (1 R. S. 728, §§ 51, 52.)

2. The statute of frauds (2 R. S. 134, § 6,) referred to by Rey as a bar to complainant's claim upon the property, does not affect her rights, inasmuch as they are fully protected by the provisions in regard to trusts above referred to, and by the general principles of the common law in regard to fraudulent conveyances.

3. The provisions of all these statutes combined, and the fact that there was no written declaration of trust in favor of John Ordronaux, Jr., show that Rey's claim to hold in trust for him, is utterly unfounded. Such a trust by parol cannot be sustained, nor could it be upheld even if in writing and duly executed, against the complainant's paramount equity ; as the supposed *cestui que trust* was in no sense a *bona fide* purchaser, and stands in the relation of a mere voluntary donee without consideration.

IV. The defendant Rey should therefore be decreed to convey the premises in question to the complainant and to account for all the rents and profits received by him, and which have not been paid over prior to notice of the complainant's equity.

V. The defendants Chastellain and Ponvert should also be decreed to account for the rents of the premises due from them, and this without any deduction on account of the note they hold against John Ordronaux.

1. They became assignees of the lease after the note had been given, and consented to hold under Rey as lessor, and then be-

came liable to him for the rent, without any right to deduct from it or set off the amount of the note.

2. They gave no credit to John Ordronaux on the strength of the lease, or of the demised premises, or of the rent. It was a simple contract debt on the personal credit of the debtor alone, created long before he owned the property.

3. The complainant's equity is not only prior in time, but also prior in right, and must prevail over the claim of every person other than a *bona fide* purchaser having actually paid the purchase money. None of the defendants, nor any person for whom they claim, stand in that relation.

*C. W. Sandford*, for the defendants, Chastellain and Ponvert, cited the Civil Code of Napoleon, articles 1456, 1457, 1402, 1409, 1410, 1412, 1419, 1421, 1482, 1492, 1494; 2 Rev. Stat. 354, subd. 10.

*H. B. Cowles*, for the defendants, J. B. Rey and J. Ordronaux, Jr.

THE ASSISTANT VICE-CHANCELLOR.—The real estate in controversy was purchased by John Ordronaux with his own funds. It is not claimed that the property which belonged to the complainant on her marriage with him, or that which she and her husband put into *community* at that time, can be traced down to the purchase of this estate. But the ground of the bill is, that the property in question actually belongs to the complainant, or at least that she has a paramount lien upon it, because her husband did not leave enough property of all kinds, to discharge her just claims under their marriage settlement. These claims consist of her separate property of 194,000 francs, which it is said he converted to his own use, and of her portion of 100,000 francs which she brought into the *community*, and of her right to 60,000 francs out of the community as a *preciput* in pursuance of article sixth of the settlement. And she insists, that by the contract of marriage and the laws of France which it adopts, she is a preferred creditor of her husband for all these claims.

It cannot be contended that there is a specific lien on this pro-
perty, or any thing in the nature of a direct equitable lien.   The
clause in article 8th of the contract " *legally mortgaging*" the
future husband's individual property, it appears to me cannot
reach across the Atlantic and effect a lien upon land bought by
him more than twenty years afterwards.   Its effect is hereafter
explained.

The case rests solely upon the claim of a lien by force of the
contract; the covenants therein, and the laws of France which it
adopts.

The provisions of the French Civil Code on this subject, are
so wholly different from the rules of law to which I am accus-
tomed, that I feel no certainty that I have been able to under-
stand them, or to trace their connection with the law of debtor
and creditor in France, which bears upon this question.

Proceeding therefore with some distrust as to their accuracy, I
will state my conclusions.

The property in question was the fruits either of the *commu-
nity* established by the marriage contract, or was John Ordro-
naux's sole property.   Article 1402 of the *Code Civil*, declares
that every immovable is reputed to have been acquired in com-
munity, unless it be proved that one of the married parties had
it before the marriage, or that it has fallen to such party since
by title of succession or donation.

Whether this property were of the community or of the hus-
band, it would, if in France, be liable for the debts which he had
contracted.   An action results against the community for all
debts contracted by the husband during its continuance.   (Code
Civil, article 1409, subd. 2.)   The compact of these parties in
article 2d of their contract of marriage does not affect third persons.
It merely relieves the community as between themselves.

As to the rights of the wife against her husband.   He has the
management of all the personal property of the wife, but cannot
alienate her immovables without her consent.   He is respon-
sible for all waste in her personal goods occasioned by the
neglect of conservatory acts.   For the price of her immovables
she is entitled to recompense out of his goods, in case of insuffi-

ciency in the goods of the community. And she may in like manner exercise her claims in general. (Code; Articles 1428; 1436, 1472.)

It is claimed here that the complainant has renounced the community in due form. This is disputed; but I will assume for the present, that it is proved. In such case she forfeits every description of claim upon the property of the community; but she has a right to resume, 1st, her immovables; 2d, the price of her immovables alienated; and 3d, all indemnities which may be due to her from the community, and she may exercise all actions for these and previous demands, against the property of the community, as also against the property of her husband. (Articles 1492, 3, 1495, and see 1514.) By these and other provisions of the Code, I understand that the wife has a right to indemnity; for her separate property converted by her husband during the marriage; and where it is so stipulated, for her contribution to the community; and that she can *exercise an action* therefor against the property of the community, and the separate property of her husband. But I do not understand that she can *exercise an action* against his separate property for any part of the *preciput*, or conventional reversion, stipulated in the marriage contract. For this she can only look to the distributable mass of the community. (Article 1515.)

Nor do I learn from these provisions that the wife has either by the law of France or by the compact, any lien, or priority over other creditors, for her claims against the community, or against his separate estate. And it would certainly be carrying our regard for these foreign contracts to an extraordinary and alarming extent, if the wife of a Frenchman, married in France, but domiciled and doing business here for twenty years, should be permitted upon his death, to retain all his estate real and personal to the entire exclusion of *bona fide* creditors, upon the stipulations of a marriage contract, registered in some city in France but wholly unknown to those dealing with him here on the faith of his apparent property. And on the claim set up in this suit, I do not perceive why the goods obtained by a French merchant trading here, from an importer on credit, might not, as well as other property of the former, be taken by the

wife at his death by virtue of these secret claims, and the creditor be turned off without a penny.

It is hardly to be imagined that such provisions would be endured in so commercial a country as France is at this day; even with the publicity which by the Code is supposed to be given to these acts of marriage.

On looking farther into the provisions of the *Code Civil*, this impression is confirmed. In the distribution of the community on its dissolution, where the wife does not renounce; to the mass of existing property, is to be added from the respective parties, all that each has withdrawn or is indebted to the community. The *passive* is then to be borne, and the debts of the community are to be at the charge of each of the married parties, in moieties. The wife's liability for these debts, is limited to the amount of her emolument; but the husband's goes to the whole extent of his separate property. If however the husband has no such property, not only the proper debts of the community, but also the debts of the husband contracted while it continued, fall upon the property of the community. These debts are equally entitled with the debts of the wife for indemnity and recompense, to *exercise an action* against the community; and thus there can be no legal priority in favor of the one or the other. The renunciation of the community relieves the wife from personal contribution to its debts. (Code, B. 3, title 5, sect. 5, 6. Articles 1467, &c.) And where the Act of marriage gives to the survivor the portion of the decedent in the community, the wife surviving has her election, either to take such portion, *becoming bound for the debts of the community*, or to renounce the community and abandon its property and *charges* to the heirs of the husband. (Article 1524.) Here again the creditors appear to stand upon as good a footing as the wife.

The title relative to *Privileges and Mortgages*, (article 2093,) provides that the property and effects of the debtor are the common pledge of his creditors; and the value thereof is distributable equally among them, unless there exist among the creditors, *lawful causes of preference*. The lawful causes of preference are *privileges and mortgages;* and *privilege* is defined to be a right which the quality of his credit confers upon a creditor, of being

preferred to others, even to mortgage creditors. (Articles 2094, 2095.)

The ranks between privileged creditors are then declared. Those in the same rank are to be paid rateably.

The *privileges* are then enumerated. Those over movables, are, in general, 1, law expenses; 2, funeral expenses; 3, expenses of last sickness; 4, salaries of servants; 5, supplies for family subsistence. (All these are also privileges over immovables.) The Code then prescribes privileged credits over certain enumerated movables. Amongst the privileges over immovables, are, 1, for the purchase money; 2, loan for the purchase; 3, for labor and materials laid out on buildings, &c. (Articles 2096 to 2105.)

Without proceeding farther with these interesting and well-considered provisions, it suffices to say, that no *privilege* is accorded to a wife by the Code, for her claims under a contract of marriage.

*Mortgage* is by the Code restricted to *immovables*, and it is either legal, judicial, or conventional; and takes place only in the cases, and according to the forms authorized by law. (Articles 2114 to 2119.)

*Legal mortgage* results from the law, and among the rights and credits to which it is applicable are those of married women upon the property of their husbands; (articles 2121, 2122;) and the right is to be exercised under certain modifications. It is this *legal mortgage* which is mentioned in the eighth article of Mrs. Ordronaux's marriage contract. The contract could not, however, enlarge the provisions of the Code as to mortgage.

*Judicial mortgage*, is analogous to our liens by judgment and decree.

*Conventional mortgage*, depends on covenants and acts of the parties, and can only be made by an Act passed in authentic form before a notary.

Therefore neither judicial or conventional mortgage have any application to this case.

Mortgage by the Code, takes precedence from the day of enrolment, with but two exceptions. One of these is for the bene-

fit of women by reason of their matrimonial covenants, for whom it exists independent of enrolment. Husbands are nevertheless enjoined to cause enrolments to be made of the incumbrance of wives on their immovables, and on default, enrolment must be demanded by the commissioner in the civil court at the domicil of the husband, or at the place where the property is situated.

Besides these provisions for publicity of the wife's mortgage, it will be borne in mind that the marriage covenants which result in this species of lien, can only be made by an Act before a notary, which remains a record in the public archives of the place where it is made, and they cannot be altered after the marriage is celebrated.

To the end that *mortgage* in favor of the wife may not render immovables virtually inalienable during coverture, the Code contains provisions for discharging the enrolment where it exists, and for exonerating the property from the mortgage, where there is no enrolment, in favor of purchasers. (Articles 2181, 2193, &c.) The result is that in France, the wife has no preference over other creditors in respect of the *movables* of her husband. She has no lien by way of *privilege* over his immovables.

She has a *mortgage* upon his immovables, which is notified to the public by her marriage articles, recorded at the domicil of the parties when they were married; and if the husband or commissioner of the civil court has discharged the duty imposed upon them, registered in the office of mortgages within the jurisdiction in which the property is situated.

It is abundantly manifest from these provisions of the Code Civil, that whether the premises in question be deemed the property of John Ordronaux, or of the *community*, the complainant has no lien or priority over other creditors. The Code refuses to contracts made in a foreign country the force of a *mortgage* in France; (article 2128;) and it would be a great stretch of international comity, to extend the local provisions of the Code which give a lien upon lands in France for the covenants of marriage, to real estate in this country. Independent of the entire inapplicability of the French mode of notifying purchasers and in-

cumbrancers ; in this state, and I believe in every country, immovables are controlled by the *lex loci rei sitæ.* We have our own modes of authenticating incumbrances, and our own laws regulating equitable liens. Creditors of persons domiciled and having property here, have a right to look to those laws and those only for the administration of their debtors estates. Justice to our own citizens forbids that we should yield a priority, such as is here claimed, upon the faith of a secret agreement made and registered in a foreign country twenty years before the parties had an interest in the property in question. It will be sufficiently oppressive on creditors dealing upon the faith of visible property, if we accord to the complainant the participation as a creditor, which the French laws appear to concede to her.

The cases to which I was referred, *Decouche* v. *Savetier*, 3 J. C. R. 190 ; and *Le Breton* v. *Miles*, 8 Paige, 261, arose between the parties to marriage settlements, or their representatives. There was no conflict in either case with the rights of creditors.

Mr. Justice Story says that as to immovable property, a contract of marriage made between parties in a foreign country, will at most, confer only a right of action, to be enforced according to the jurisprudence *rei sitæ.* Story's Conflict of Laws, 160, § 184. He cites to the same point, Henry on Foreign Law, 48, 49, 95.

With this authority and the plain good sense of the matter concurring, I must hold that the complainant has neither a lien upon, or a priority over, the real estate in dispute.

As the bill proceeds solely upon the ground of preference and equitable lien in favor of the complainant personally, it cannot be sustained.

This conclusion leaves untouched the rights of the complainant as a creditor, and also the defendants claim to set off their debt against the rents.

The bill must be dismissed with costs,